Mr. Simon. Good morning, Your Honor. May it please the Court. Robert Simon for Placid Oil, LLC, which I will refer to as Placid. Placid reorganized in Chapter 11 back in the 1980s. Placid worked diligently to identify creditors and notify them of the bar date. However, Placid was not clairvoyant and could not identify every possible creditor. Placid provided notice of the bar date by publication three times in the Wall Street Journal, which this Court has twice held in other Placid cases, to have been sufficient for due process purposes for unknown creditors. Avalon's predecessor in title was an unknown creditor on September 30, 1988, when Placid received his discharge. In bankruptcy, the term known creditor means that both the claim and the claimant are reasonably ascertainable, not just reasonably foreseeable. That's the Crystal Oil case from this Court, 158 Fed 3rd, 297, back in 1998. For a claim to be reasonably ascertainable, the debtor must have in his possession at the very least some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom the debtor would be liable. Whether a particular creditor is known or unknown is entirely an issue of fact and not a legal conclusion. Again, Crystal Oil. The Bankruptcy Court erroneously determined that Avalon's predecessor was a known creditor when Placid received its discharge and granted summary judgment. In doing so, the Bankruptcy Court made two principal errors. First, the Court mischaracterized the June 10, 1965 agreement between Placid and Ernest Cockrell, Jr. as an assignment of an existing lease that created a direct landlord-tenant relationship between Placid and the landowner. That instrument was a sublease that did not create such a relationship. The Bankruptcy Court further erred in concluding as a matter of law that Avalon's predecessor was a known creditor despite substantial contrary evidence. That determination is properly an issue of fact and the Bankruptcy Court erred in treating it as a legal conclusion. I'll take these two issues in order. The 1965 agreement was a sublease under Louisiana law. On October 12, 1962, Avalon's predecessor, whom I will call the landowner, entered into a service lease with Cockrell for a 20-acre parcel on which Placid would later build two natural gas processing plants. I will refer to the 1962 lease as the surface lease. By agreement dated June 10, 1965, which I will call the 1965 agreement, Cockrell transferred an undivided one-half interest in the surface lease and possession to Placid under certain limiting terms and conditions, which required Placid to do at least three things. One, pay rent to Cockrell. Two, obey the covenants in the surface lease. And three, transfer its leasehold interest back to Cockrell if Placid chose to relinquish possession. Louisiana law determines the legal character of an instrument by the rights it creates, not by the title of the instrument, the terminology it uses, or how it's referred to in extrinsic documents. That's the Smith v. Sun Oil case, 116 Southern Reporter at 380. An instrument that is titled as an assignment and uses assignment-like language, such as grants, conveys, transfers, and assigns, remains a sublease if the purported assignee retains any interest in the underlying lease after the transfer and the instrument imposes additional obligations on the purported assignee. Again, Sun Oil, 116 Southern Reporter at 381. The critical distinction between an assignment and a sublease is whether the original lessee retains any rights in the leasehold after the contract with the assignee or subleasee assigned. There are numerous Louisiana cases on that, but including Broussard v. Hassey Hunt Trust, 231 Louisiana Reporter at 481, and Bond v. Midstate Oil, 219 Louisiana Reporter at 428. This leads us to a simple, straightforward analysis. The 1965 agreement was a sublease and not an assignment because Cockrell retained important rights in the sublease that he did not transfer to Placid, and Placid assumed new obligations to Cockrell it did not previously have. First, under the 1965 agreement, Cockrell transferred an undivided one-half interest in the surface lease to Placid under certain limiting terms and conditions and retained an undivided one-half interest. Plainly, Cockrell did not transfer all of his rights in the surface lease to Placid. Second, Cockrell retained the exclusive right to pay rent to the landowner and expressly disclaimed any liability to Placid for failure to pay the rent unless Cockrell acted in bad faith. So, if Cockrell negligently failed to pay the rent and the surface lease expired, Placid's rights would have gone away and Placid had no remedy against Cockrell. Those limiting conditions are important rights. The fact that Cockrell retained them proves that Placid and Cockrell did not have equal co-ownership in the surface lease. Third, Placid agreed to pay rent to Cockrell. Equal to one-half of the rent, Cockrell was required to pay the landowner under the surface lease. The 1965 agreement characterizes this rental obligation as proportional sharing, but that language is window dressing. Cockrell paid 100% of the rent to the landowner, not 50%, to maintain the surface lease. Placid then paid half of that amount to Cockrell to maintain its right to possession from Cockrell. That is a sublease. Fourth, if Placid chose not to retain its interest, Placid was required to transfer that interest back to Cockrell, not to the landowner. Thus, Cockrell retained a reversionary right in the interest he subleased to Placid. In Louisiana law, the retention of reversionary rights makes the agreement a sublease rather than an assignment regardless of what it is called. One example that Prestridge v. Humble Oil, 131 Southern Reporter at 824, is an example. If the 1965 agreement had been an assignment, any interest given up by Placid would have reverted to the landowner, not to Cockrell. Fifth, assignment is a one-time transaction. The assignor assigns his interest to the assignee and then severs any relationship with the landowner as to the interest assigned. The assignee assumes the obligations to the landowner but has no ongoing relationship with the assignor. Conversely, a sublease is not a one-time transaction. It creates a new contractual relationship between the sublessor and the sublessee. The 1965 agreement preserved the landlord-tenant relationship between the landowner and Cockrell and preserved all of that relationship and then created a new contractual relationship between Cockrell and Placid. That's a sublease. Regrettably, the bankruptcy court got distracted by the terminology of the 1965 agreement in confused form with substance. But in Louisiana, the substance controls over the form. The landowner gave the surface lease to Cockrell. Subsequently, Cockrell gave Placid a one-half undivided interest in the right to possession, provided that Placid paid rent to Cockrell for the use of the property, Placid obeyed the covenants in the surface lease, and provided that Placid transfer its interest back to Cockrell if Placid chose to give up possession. Those terms constitute a sublease. That distinction matters because assignment creates privity between the assignee and the underlying landowner. Conversely, a sublease does not. When the parties enter into a sublease, a new contract comes into existence which is separate and distinct from the original lease between the owner and the sublessor, and there is no privity of contract between the sublessee and the original landowner. That's the Dixie Services case. There are many others, but that's one. 955 Southern Reporter, seconded 222. The 1965 agreement preserved the landlord-tenant relationship between Cockrell and the landowner, and again, preserved all of it, and then created a new sublease between Cockrell and Placid. The 1965 agreement did not make Placid into a tenant under the surface lease. Accordingly, Placid was not required to notify the landowner of the deadline for assumption or rejection of unexpired leases in its Chapter 11 case because Placid was not a party to the surface lease and was not in privity with the landowner, and the landowner was not a party to Placid's sublease from Cockrell. The bankruptcy court simply misunderstood that reality. Second issue, known creditor. The bankruptcy court erred again in concluding that the landowner was ipso facto a known creditor because of a non-existent landlord-tenant relationship the court erroneously identified. The determination of whether a claimant was a known creditor is entirely an issue of fact, not a legal conclusion. Again, Crystal Oil and also Shelton Property Rural Acreage v. Placid Oil Company. A case out of this court from 2011, cited in the brief. The relevant issue is whether the claim Avalon now asserts was reasonably ascertainable on September 30, 1988. The evidence says that it was not. First, Placid was not aware of the environmental claims which the bankruptcy court has acknowledged. Quote, Placid and Avalon's predecessor, like in Shelton and Cabinham, had no knowledge of the environmental claims on the petition date. That's in the Record on Appeal at page 42. Second, there was no landlord-tenant relationship between Placid and the landowner. Third, even if a direct landlord-tenant relationship had existed, there is strong evidence that neither Placid nor the landowner was aware of it at the time. Placid's books and records do not reflect such a relationship. Placid worked diligently to identify, schedule, and notify every creditor of relevant deadlines. However, Placid's schedules do not reflect a surface lease from the landowner. Placid had no reason to omit the surface lease from the schedules had Placid been aware of it. Additional facts. Placid never paid rent to the landowner. The landowner never received rent from Placid. There is no evidence the landlord ever contacted Placid in 26 years of this alleged tenancy. There is no evidence the parties ever communicated with one exception. The only known communication between Placid and the landowner was a letter about noise abatement dated August 29, 1990, nearly two years after plan confirmation. That letter proves only that Placid knew the identity of the landowner, which was never disputed. The letter does not refer to any lease. It does not refer to any landlord-tenant relationship. The bankruptcy court found a landlord-tenant relationship that neither Placid nor the landowner recognized at the time. Reasoning from that incorrect premise, the court concluded that the landowner was ipso The evidence does not show that, and the bankruptcy court erred in drawing that legal conclusion contrary to the evidence. The court should reverse the summary judgment and remand the case back to the bankruptcy court for trial. Any questions? Thank you. Ms. Poole. Good morning. May it please the Court, my name is Leah Poole, and I represent Avalon Farms, Inc., along with my co-counsel, Mr. Doug Draper. This morning, I will be addressing Placid's mischaracterization of the 1965 assignment, and Mr. Draper will address the bankruptcy issues. This is a case about an unexpired surface lease on which Placid and Avalon were counterparties at the time of Placid's bankruptcy. Avalon granted the surface lease to Ernest Cockrell, Jr. in 1962, and in 1965, Placid took an assignment of an undivided one-half interest in the surface lease in order to construct two gas plants on Avalon's property. Placid operated those gas plants from 1965 until 1991. That's 21 years of leasing and operating a 20-acre plant site on Avalon's property prior to the bankruptcy, two years of leasing and operating the plant site on Avalon's property during the bankruptcy, and three years of leasing and operating the plant site on Avalon's property after the bankruptcy. And Avalon got zero money in return for this? Oh, they were compensated. I'll bet they were. The surface lease did allow a payment of, I believe, $500. I'm sorry, $1,500. $1,500 what? $1,500 for rent. Total amount? Yes, yes, Your Honor. For Avalon? Yes, Your Honor. Okay. Some kind of philanthropist on land ownership. At all times during the bankruptcy, Placid owned and operated the gas plants on Avalon's property pursuant to the surface lease granted by Avalon. As this Court knows, schedules of assets and liabilities are arguably the single most important disclosure made by a Chapter 11 debtor. Given that Placid was actively operating an inherently expensive gas plant on Avalon's property at the time of its bankruptcy, one might assume that Placid would identify Avalon somewhere in the bankruptcy schedules, but Placid admits that it did not. Given that Placid was a counterparty to an unexpired surface lease at the time of its bankruptcy, one might assume that Placid would identify the surface lease somewhere in its bankruptcy schedules, but again, Placid admits that it did not. Whether intentional or careless, Placid failed to give notice to Avalon when it had a legal obligation to do so, and it is because of those failures by Placid that we are before the Court today. Since Placid cannot travel back in time and do the things it failed to do during the bankruptcy, it is attempting to rewrite history. Nearly six decades after the fact, Placid now argues that the 1965 assignment is a sublease and that Placid never acquired an interest in the surface lease. The parties agree on the legal principles and even cite to the same cases about the characterization of the assignment, but what makes Placid's argument incredible is that it depends entirely on this Court taking Placid's word over the written word of the historical documents that Placid drafted, executed, and recorded. First, as evidence that the 1965 assignment was a sublease, Placid points to Schedule B-1G of the bankruptcy schedules, which purportedly lists Placid's non-oil and gas leasehold interest and provides for each the location of the property, the name of the lessor, and the terms of the lease. The specific entry that Placid relies on is a five-word entry, and it reads, quote, Patterson, St. Mary Parish, Louisiana, end quote. Unlike every other lease entry, the Patterson entry does not contain any of the basic information necessary to identify the lease or the counterparties to that lease. Not only do those five words not say that Placid had a sublease with Cockrell, as Placid claims it does, those five words illustrate how flippantly Placid took its obligation to creditors during the bankruptcy. Second, Placid relies on its careful rephrasing of the 1965 assignment to argue that the assignment is a sublease. For instance, Placid claims the 1965 assignment assigned to Placid a one-half undivided surface leasehold interest in a 20-acre parcel. Contrary to Placid's phrasing, the 1965 assignment says, Cockrell, as Asinor, does hereby grant, assign, and convey unto Placid as Asinor, quote, an undivided one-half of Asinor's right, title, and interest in and to the following leases. The document goes on to list two leases covering Avalon's property. The first is the surface lease that's at issue in this case, and the second is a companion lease that Placid released prior to the bankruptcy, and it is not at issue in the case, although I will mention it again in just a moment. The 1965 assignment further states, quote, Asinor, by the acceptance hereof, expressly agrees to assume the covenants and obligations of said instruments to the extent of the interests acquired hereunder, end quote. Additionally, despite Placid's extensive efforts to paint the reciprocal right of first refusal as a reversionary right, even a cursory reading of the unmanipulated text undoes that argument. The provision as it is written in the 1965 assignment says, quote, if at any time either Asinor or Asinee does not elect to maintain his or its interest in either of said leases in force and effect, and the other party does so elect and takes the necessary actions to maintain said lease or leases in force and effect, the non-electing party shall promptly execute and deliver to the other party a reassignment of his or its interest in such lease or leases, end quote. Third, a glaring problem with Placid's argument that the 1965 assignment is a sublease is the fact that Placid and its successors in title have treated the 1965 assignment as an assignment for nearly six decades. The public conveyance records show that in 1982, Placid and Avalon executed a release of lease contract in which Placid granted to Avalon a release of the companion lease. In that release, Avalon appears as lessor and Placid appears as lessee by virtue of the 1965 assignment. If Placid's claims about the 1965 assignment were true, then there would be no legitimate reason for Placid to have granted Avalon a release of the companion lease or to have appeared in that document as lessor because it is impossible for the same text in the same document to have one meaning for the surface lease and a separate meaning for the companion lease. Additionally, the public conveyance records show that Placid went on to mortgage its interest in the surface lease and later to sell its interest in the surface lease. The fate of Placid's one-half undivided interest in the surface lease can be traced through decades of instruments recorded in the public conveyance records of St. Mary Parish. The truth is in the documents. The facts and law do not permit us to rewrite decades of conveyance records, nor do they permit us to rewrite bankruptcy schedules to make up for Placid's failures all of those years ago. The 1965 assignment is by its own terms an assignment. The Bankruptcy Court and the District Court did not err in finding that Placid had a contractual relationship with Avalon at the time of the bankruptcy because the 1965 assignment constitutes an assignment under Louisiana law. Thank you. Okay, Mr. Draper. Thank you, Your Honors. I get the rare privilege to address the bankruptcy issues and unfortunately in my presentation, I get to cite a case that I lost before this court, which is not very good. Judge Jernigan rendered a rather large opinion. She distilled this case down to one issue and that is this case is simply a notice case about an unexpired lease of real property and the assumption of rejection. You've heard a great deal by counsel for Placid about this as a notice case and the determination of whether it's actual or constructive notice. The truth is, number one, this court, National Gypsum, held specifically that the assignment of a lease, that the determination to assume a lease, requires actual notice, period, end of story. The court said that, National Gypsum stands for that proposition. Number two, the determination of whether a party's a known or unknown creditor only addresses the type of notice they're entitled to receive. It does not say they're entitled to receive no notice. And so what the courts have done, and the Placid cases are classic examples, is they used a bar date to give constructive notice to parties. Here, they were trying to assume a lease. They didn't give actual notice and they didn't give constructive notice. Had they published the assumption in the Wall Street Journal like they did before, it may be different. But National Gypsum says you still have to give actual notice. So known or unknown only goes to the quality and the quantity of notice that you get. It does not absolve a party from giving no notice. The next issue that's really problematic, and I'll address this, is the global assumption of the lease in the plan of reorganization. This court, in a case I lost, in the Ray O'Connor case, said a global assumption where you just say, I'm assuming all the leases, is not an effective assumption. What the court said in that case was that you have to specifically identify the lease. You have to identify the cure amount and give the party the opportunity to come over. What the court said in O'Connor was that if you have a global assumption, it is not an assumption and it rides through the bankruptcy, which means the rights are unaffected by the  bankruptcy. Last point that I think is very important, and that goes to this bar date that Placid is hanging its hat on. This court in National Gypsum made the following comment, and it's true. The issue of a counterparty to an executory contract or lease does not know it has a claim at the time the bankruptcy is filed. The court in National Gypsum said, we're going to discount and you don't need to file a preemptive proof of claim. The time the claim arises is when the lease or the executory contract is assumed or rejected. That's the moment. Because if the lease is assumed, I'm no longer a party to the bankruptcy, I'm not a creditor. My rights are limited to the cure, the adequate assurance of future performance, and compensation for the delay in getting my money. If in fact the lease is rejected, then I have a time period that's always set out, and it's set out in the Placid plan, to either assume, to file my proof of claim for rejection damages. 11 U.S.C. 365 identifies what my claim is and how much I can put in. But the important point is, my moment of being a creditor does not arise until after the bar date is ... The bar date is only for pre-petition claims. The claim that I have for a rejected contract, if that was the case, arises after that date. So the use of the bar date as a sword or as a shield to bar them is really a red herring. The use of the argument that the difference between known and unknown is a red herring. Because again, I am entitled to notice. The cases never say I'm entitled to no notice. I either get actual or constructive. That's the law, and that's what the Constitution provides for in my due process. So the real point of this is, the arguments on the bankruptcy front are just ... They're not justified. They're specifically taken out by this court's decision in O'Connor and National Gypsum. And I also call your attention to the good faith or bad faith argument that's being made by Placid. If you look at footnote nine in National Gypsum, basically what the footnote says is the good faith or bad faith of the debtor is not really relevant. They could have the best faith in the world. If they miss it, the idea of notice and the idea that you have to have notice is for protection of the counterparty to the contract. That's what that footnote says, and it is my protection that I'm entitled to the notice. And so I'd ask the court to really take a hard look, because really the arguments that Placid is making on the bankruptcy front are red herrings. There is no justification under any set of circumstances for a counterparty to an executory contract or lease to get no notice. There is none. Whether you're known or unknown, it doesn't matter. And again, this court has said that. This is a duty of a rather large company, and each debtor has to do their schedules in a fashion. If they miss us, it's their problem. They could have possibly protected themselves by filing another notice, a constructive notice to say, this is the date for you to assert the assumption of rejection. This is the date by which an administrative claim has to be filed. They never did that. And so this falls into a very simple case. From a bankruptcy point of view, is notice required for the assumption of an executory contract? I think the answer is yes. This court has said in National Gypsum that the notice must be actual. Judge Jernigan got it right. And it is very hard to move off of that from a constitutional perspective. Does anybody have any questions for me? Just . . . Yes, Your Honor. Thank you. Thank you. All right. Mr. Scheinman. Thank you, Your Honors. And again, may it please the Court. I can answer the Court's questions as to whether Avalon's predecessor entitled was a philanthropist. No, they were not. Avalon's predecessor owned hundreds and hundreds and hundreds of acres of land around this particular 20-acre parcel in which there were multiple oil and gas leases, in which Placid was a party to approximately 10 of them. But they were all . . . all those leases terminated before the bankruptcy. So there was no question that those were all pre-petition claims and were discharged by the bankruptcy. But this natural gas plant, of course, allowed all those other leases to operate. And, of course, yes, they received hundreds of thousands, millions of dollars, we'll never know, from all those oil and gas leases. The plant is what, of course, made those leases so valuable. No, they were not being philanthropic. But fundamentally, the issue is still knowledge. Yes, Mr. Draper is correct that the creditors are entitled to notice. But the problem is always, what does the debtor know? And there is a great deal of case law that deals with that, and the answer is, for due process purposes, if you're a known creditor, you're entitled to direct notice. If you're an unknown creditor, you're entitled to the best notice that can otherwise be provided, which is publication notice, which is what Placid provided. If Placid had known that Avalon's predecessor was its landlord, Placid would have provided that notice, but Placid did not know that, for a variety of reasons, but principally because Avalon's predecessor was not Placid's landlord. However, Pennzoil was, and this is in the record. Eventually, Cockrell died, and his family transferred, later his heirs transferred his interest to Pennzoil, that happened in 1985. Pennzoil was notified of the bankruptcy. We have that. That's part of the record as well, and Pennzoil filed a proof of claim for its lease rejection, for cure of any defaults on the leases, and that's also in the record. So Placid provided direct notice to the creditor, the landlord, that it knew about. As to whether Avalon's predecessor was Placid's landlord, this is really just a simple analysis and it goes back to Louisiana law and what the 1965 agreement says. Under Louisiana law, it does not matter what language the agreement uses or how it is described or how it is titled or how it is referred to in subsequent documents. The issue is what rights does it create, what rights are retained, and Avalon, excuse me, Cockrell retained the sole right to pay all of the rent, not 50% of the rent, but all of the rent. So looking back at the 1965 agreement, a long time ago, before I was born, barely, but these parties, pretty sophisticated parties, used certain terms, they chose certain language, asinur, asini, so we shouldn't really give any interpretive weight to the terms chosen by these pretty sophisticated parties. The answer under Louisiana law is no, you do not. You look at the rights that are created, the rights that are retained. There is a huge body of law about this in Louisiana. Most of it arises under mineral leases, but not all of it, and it actually goes back to French law, and under French law, if you were a tenant and you assigned less than 100% of your rights, you created a sublease, and Louisiana law has followed through with that, and so the answer is no, this document is not an assignment because Cockrell retained the exclusive right to pay rent, he excluded liability if he failed to pay the rent, excluded liability to Placid if he failed to pay the rent unless he did it intentionally, Placid paid rent to him and not to the landowner, and Cockrell retained a right of reversion, which means if Placid decided to give up his interest, that interest came back to Cockrell and not to the landowner, and under Louisiana law, that's the end of the story. That makes it a sublease no matter what, and the fact that subsequent documents, you know, when lawyers looked at subsequent documents, they saw the terminology and they used consistent terminology, thank you, but that doesn't change anything. Look at the Ottinger article in the briefing that talks about this tradition of nomenclature in Louisiana law. Thank you. All right, thank you. Interesting case. The court stands in recess. Thank you very much.